FRANK BOYER AND THE ESTATE OF NANCY BOYER, DECEASED, FRANK BOYER AND EDWARD HABERERN, CO-EXECUTORS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Boyer
Docket Nos. 6728-89, 6765-89, 6476-90, 12620-90
United States Tax Court
T.C. Memo 1992-724; 1992 Tax Ct. Memo LEXIS 762; 64 T.C.M. (CCH) 1570; December 22, 1992, Filed Decisions will be entered under Rule 155. For Petitioners: William R. Cousins, III and Lauren C. LaRue. For Respondent: Marikay Lee-Martinez and Rachael J. Zepeda. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These cases were assigned to Special Trial Judge D. Irvin Couvillion pursuant to the provisions of section 7443A(b)(4) [2] and Rules 180, 181, and 183. The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE COUVILLION, Special Trial Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes, additions to tax, and increased interest, as follows: Frank and Nancy Boyer, docket No. 6728-89: Increased Interest and Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)(1) & (2)
6659
6661
1981
$ 45,778
[1]
[2]
$ 13,733.40
--
1982
12,040
[1]
[2]
3,612.00
[3]applies 1983
16,559
[1]
[2]
4,967.70
[3]applies 1984
46,098
[1]
[2]
13,829.40
[3]applies 1985
3,928
[1]
[2]
1,178.40
--
*763 R. Dale Jost, docket No. 6765-89: Increased Interest and Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)(1) & (2)
6659
6661
1985
$ 98,769.10
[1]
[2]
$ 29,630.73
[3]applies *764 Billy G. and Doris A. Nix, docket No. 6476-90: Increased Interest and Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)(1) & (2)
6659
6661
1981
$ 14,172.00
[1]
[2]
$4,251.60 --
1982
15,891.00
[1]
[2]
4,767.30
[3]applies 1983
7,892.00
[1]
[2]
2,367.60
[3]applies 1984
10,968.00
[1]
[2]
3,290.40
[3]applies 1985
55,629.44
[1]
[2]
11,768.44
applies
1986
45,384.86
[1]
[2]
8,727.32
applies
Charles W. and Deborah J. Godwin, docket No. 12620-90: Increased Interest and Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6621(c)
6653(a)(1) & (2)
6659
6661
1981
$ 45,310
[1]
[2]
$ 13,593
--
1982
11,013
[1]
[2]
3,304
[4]applies 1984
75,570
[1]
[2]
12,171
applies
1985
10,108
[1]
[2]
3,032
[4]applies 1987
33,477
[1]
[2]
10,043
[4]applies *765 These cases are part of a larger group of cases which respondent has identified as a national litigation project known as William Max Young (Alberta Livestock Transplant) -- PO. The subject cases were selected as test cases to determine the deductibility of certain losses and investment credits in connection with transactions involving registered cattle known as: (1) The 1984 William Max Young & Associates Donor Cow Program (the donor cow program); (2) the 1984 William Max Young & Associates Embryo Program (the 1984 embryo program); and (3) the 1985-MJ or 1986 Global Capital Management Embryo Program *766 [3] *767 (the 1986 embryo program). The issues for decision are: (1) Whether petitioners' purchases of donor cows or embryos under the programs had economic substance, business purpose, and profit motive so that the losses and investment credits attributable thereto should be recognized for Federal income tax purposes; [4] (2) if so, the proper amount of income, deductions, and investment credit to be taken into account by each petitioner; (3) if so, whether section 465 limits the losses deductible by petitioners; (4) whether petitioners are subject to the various additions to tax; and (5) whether petitioners' participation in the programs constituted tax-motivated transactions within the meaning of section 6621(c). FINDINGS OF FACT Some of the facts were stipulated and are so found. The stipulation of facts and the annexed exhibits are incorporated herein by reference. Petitioners
Petitioners Frank and Nancy Boyer were residents of Pennsylvania at the time their petition was filed. Petitioner R. Dale Jost was a resident of California when his petition was filed. *768 Petitioners Billy G. and Doris A. Nix were residents of Kansas at the time their petition was filed. Petitioners Charles W. and Deborah J. Godwin were residents of Tennessee when their petition was filed. Petitioners Frank Boyer (petitioner Boyer), R. Dale Jost, and Charles W. Godwin (petitioner Godwin) are medical doctors. Nancy Boyer, who was deceased at the time of trial, was also a medical doctor and, like her husband, specialized in cardiology. Prior to his retirement in 1986, Dr. Jost specialized in anesthesiology. Dr. Godwin's medical specialty is gynecology and obstetrics. Each of the physicians initially became aware of the cattle programs at issue through seminars sponsored by an individual named Gene Balliett, who was a former editor of a publication called Medical Economics. Petitioner Billy G. Nix (petitioner Nix) learned of the donor cow program through his son, Billy Chris Nix, who is a medical doctor and who also became aware of the programs through one of the Balliett seminars. Petitioner Nix retired from the United States Air Force in January 1980 and was employed in the aircraft industry during the years at issue. Petitioners had no expertise in cattle *769 at the time they made their investments, although petitioner Nix grew up on a farm with dairy cows, and petitioner Godwin also lived on a small farm during his childhood. Each of the physician-petitioners had knowledge of genetics through his medical school training, and Dr. Godwin was also familiar with some of the theories underlying the embryo program through his medical practice, which included care of patients with fertility problems. The Entities Involved With the Programs
Worldwide Capital Management was based in Dallas, Texas, and provided tax advice to clients. It promoted the donor cow and 1984 embryo programs at issue in these cases. Global Capital Management promoted the 1986 embryo program. William Max Young & Associates was a cattle advisory company in Phoenix, Arizona, and was the original manager of petitioners' cattle in the donor cow program. Leonard Bestgen was an employee of William Max Young & Associates and, in November 1985, assumed management of petitioners' cattle through his own company, Greatwestern Trading Co. Alberta Livestock Transplants, Ltd. (Alberta Livestock Transplants, or ALT), was a Canadian corporation engaged in embryo transplantation *770 in registered cattle and was the seller of the donor cows in the donor cow program and the source of the embryos involved in the embryo programs. All embryos sold by petitioners in the donor cow program and all calves sold by them in the embryo programs were to Alberta Livestock Transplants. Dr. David D. Dyrholm was an owner and president of Alberta Livestock Transplants in 1984 and 1986 when petitioners invested in the programs. Dr. Dyrholm, with his wife, Joey Dyrholm, also owned Jo Resources Ltd., a Canadian corporation. Terrence Mitenko was an owner (through Terrejo Enterprises Ltd., a corporation he owned with his wife, Josephine Mitenko) and a director of Alberta Livestock Transplants. Rivergold Farms Ltd. (Rivergold) was a Canadian corporation which was owned in 1985 by Terrejo Enterprises Ltd. and Jo Resources Ltd. Rivergold became the lessee of petitioners' donor cows during 1985. The North American Association was a cooperative organized to sell calves of investors in the embryo programs. All of petitioners' sales of embryo progeny were conducted through the North American Association, and all such sales, as noted earlier, were to Alberta Livestock Transplants. *771 The 1984 William Max Young Donor Cow Program (the donor cow program)
All petitioners in these cases invested in the donor cow program through Worldwide Capital Management. Under the terms of this program, petitioners purchased registered cows [5] from Alberta Livestock Transplants during 1984 as follows: Petitioner
Number of Cows
Price Per Cow
Total Investment
Boyer
8
$ 26,000
19
28,500
$ 749,500
Jost
21
28,500
598,500
Nix
15
26,000
390,000
Godwin
9
26,000
12
28,500
576,000
At trial, Dr. Boyer produced registration certificates for 25 Simmental cows and 1 Brahman cow. Of the Simmental cows, the registration certificates reflect *772 that six were born in the first quarter of 1984. Dr. Jost produced 26 Simmental certificates and 1 Brahman certificate. Some of Dr. Jost's certificates indicate that the cows were obtained through foreclosure from another investor, Mr. Tolbert. Dr. Jost acquired nine additional cows through a transaction with Mr. Tolbert. The Jost registration certificates show that nine of the donor cows acquired from Alberta Livestock Transplants in the donor cow program were born in 1984, and one was born in 1985. Petitioner Godwin produced 20 Simmental and 1 Brahman registration certificates. His Simmental cows were all born between 1981 and September 1983. Petitioner Nix produced 15 certificates for Simmental cows, 6 of which were born in March 1984. The program required cash down payments of $ 1,820 per cow for animals purchased for $ 26,000, and $ 1,995 for the $ 28,500 cows, together with execution of unsecured promissory notes payable to the seller, Alberta Livestock Transplants, for the balance of the purchase amounts. The notes were due in 5 years and required no principal payments prior to the due date. The donor cow program provided that Alberta Livestock Transplants would breed *773 petitioners' cows using embryo transplant technology. This technology involved hormonally inducing "superovulation" in a cow with desirable genetic traits (the donor cow) and fertilization of the ovum through artificial insemination using semen of genetically desirable bulls, followed by removal of the resulting embryos through a process known as "flushing" and implantation of the embryos in lesser quality recipient cows for completion of the pregnancy and birth of the calves (referred to as progeny). Embryos could be frozen for implantation at a later date. It was represented to investors that a donor cow could be flushed three or four times during a year, ordinarily resulting in recovery of multiple embryos in each procedure. The purpose of the technique was to increase the progeny of a genetically superior cow. Ordinarily a cow will produce only 8 to 12 calves during her lifetime. The donor cow program offering memorandum provided that Alberta Livestock Transplants would receive one-half of all embryos produced by petitioners' donor cows for the services of ALT in breeding and flushing the cows. The offering memorandum projected sufficient revenue from sales of the remaining *774 embryos to retire the investor's promissory note, pay the cost of care and feeding of the cows, and generate a profit for the investor. The projections assumed that each cow would produce 24 embryos each year for 5 years at a price of at least $ 750 per embryo. Pursuant to a management contract with William Max Young & Associates, petitioners were charged separate fees, on a per-head basis, for care and feeding of the donor cows. Sales of embryos from petitioners' cows were to be made through Alberta Livestock Transplants, and ALT would retain sufficient portions of the sale proceeds to pay principal and interest on petitioners' promissory notes, as well as the expenses associated with caring for the donor cows. In 1985, Leonard Bestgen presented petitioners with the option of leasing their donor cows to Rivergold Farms. The prospect of leasing the cows had not been contemplated at the time petitioners entered the program and was not part of the original donor cow program. Under the Rivergold lease agreements, Rivergold would have unlimited use of the donor cows for at least 7 quarters (21 months) and could extend the lease for an additional 21 months to allow for natural breeding *775 of any cow that was unsuitable as an embryo transplant donor. The lease specified that Rivergold would flush each cow once per quarter and retain all embryos for its own purposes. Petitioners would be paid $ 2,900 per flushing and could elect to receive the entire amount due under the lease ($ 20,300 for seven flushings) in the first year of the lease. Rivergold was required to pay all expenses of maintaining the cows during the lease and agreed to carry liability insurance on the animals. All petitioners entered into leases with Rivergold and control of the cows was relinquished to Rivergold for the duration of the lease. It appears that the cows remained situated during the Rivergold lease at the same ranches where they had been previously maintained by Alberta Livestock Transplants. Some of petitioners' cows were held over past the initial lease term for natural breeding by Rivergold under the provision extending the lease for cows that had proved unsuitable for use as embryo transplant donors. Lease payments due petitioners under the agreement with Rivergold were credited to principal and interest on petitioners' notes to Alberta Livestock Transplants by interaccount transfers *776 between Rivergold and ALT through a Canadian bank. As a result of these credits, petitioners' purchase money notes to Alberta Livestock Transplants were marked "paid" and returned to petitioners. All of petitioners' donor cows were sold at auction in 1989 for $ 700 per head. 1984 William Max Young Embryo Program (the 1984 embryo program)
Petitioners Boyer, Godwin, and Jost invested in the 1984 William Max Young Embryo program. This program provided for the sale of an embryo unit (defined as 20 embryos that were expected to yield 10 viable pregnancies) for $ 36,000 or $ 39,000 per unit. Cash payments of $ 9,000 and $ 12,000 were required for the $ 36,000 and $ 39,000 units, respectively, together with an unsecured note for the balance of the purchase price. The notes were payable in 30 months and bore interest at the rates of 12 percent (for the $ 36,000 unit) and 11 percent (for the $ 39,000 unit). Petitioner Godwin purchased two units at $ 36,000 per unit; petitioners Boyer and Jost each purchased one unit for $ 39,000. Although the program was structured as a sale of 20 embryos per unit, petitioners expected to receive 10 calves from the program, regardless of whether *777 implantation of their 20 embryos resulted in more or less than 10 live births. As projected in the program's promotional materials, sales of 8 of the 10 calves to be born from the embryos would pay the costs of the program, including the purchase money note, leaving two calves to be retained or sold by the investor for a profit. Petitioners deducted the full purchase price of the embryo units as an expense in the year purchased. [6]
*778 Petitioners were each provided what was referred to at trial as "embryo assignment" sheets consisting of lists of 20 matings per unit, each entry consisting of a donor cow dam identified by ear tag or tattoo number and breed and a sire identified only by name, without breed designation, tattoo numbers, registration numbers, or other identifying information. A recipient cow, identified by a number and location, was also listed. No information was provided concerning dates of flushing of the donor cow or implantation of the embryos. Dr. Boyer provided two registration certificates for calves he claimed were born of embryos acquired in this program. Dr. Godwin provided four registration certificates, and Dr. Jost provided one certificate for claimed embryo progeny from this program. None of the animals identified in petitioners' registration certificates match the information on the embryo assignment sheets in that either the dam, the sire, or both, as reflected on the certificates, differ from the dam and sire information shown on the assignment sheets. Genetically, the animals represented by petitioners' seven registration certificates could not be the result of any of the breedings *779 shown on the embryo assignment sheets produced by petitioners. Greatwestern Trading Co., owned by Leonard Bestgen, invoiced petitioners Godwin and Jost in 1986, and North American Association, the cooperative, invoiced Alberta Livestock Transplants in 1987 for the following amounts pertaining to Dr. Jost's one unit and Dr. Godwin's two units in the 1984 embryo program: June 13, 1986
Godwin
Jost
Feed and care
$ 25,200
$ 12,600.00
Interest
10,395
5,197.50
Principal payment
3,586
1,793.00
Total      $ 39,181
$ 19,590.50
March 31, 1987
Godwin
Jost
Feed and care
$ 7,200 $ 3,600 Feed and care
1,440
720
Interest
4,620
2,310
Principal payment
50,414
25,207
Management fees
326
163
Total      $ 64,000
$ 32,000
The Godwin invoices were paid by Alberta Livestock Transplants, crediting $ 39,181 to Dr. Godwin's account to reflect proceeds from the sale of eight calves for a total price of $ 39,181 on June 13, 1986, and the sale of an additional eight calves for a total price of $ 64,000 on March 31, 1987. The proceeds of both sales were payable through the North American Association; the purchaser in both instances was Alberta Livestock *780 Transplants. Dr. Jost reported the sale of four calves to Alberta Livestock Transplants through the North American Association on June 13, 1986, for $ 19,590.50, and an additional four calves on March 31, 1987, for $ 32,000, with the proceeds of these sales being credited to Dr. Jost's account with ALT. Global Capital Management 1986 Embryo Program (the 1986 embryo program)
The 1986 embryo program offered one unit (10 pregnancies from 20 embryos) for $ 38,000, payable $ 12,500 cash per unit and an unsecured promissory note for $ 25,500, bearing interest at 12 percent per annum and payable in 36 months. Dr. Jost purchased two units at a total cost of $ 76,000, executing a note for $ 51,000; Dr. Godwin purchased six units at a total cost of $ 228,000, executing a note for $ 153,000. The embryo assignment sheets provided to petitioners in this program were similar to the ones in the 1984 embryo program, differing only in the following respects: (1) No breed designation was listed for the donor dams; and (2) the lists contained only 10 entries per unit, with the notation that "A list of the ten (10) embryo transplants that failed to produce a pregnancy is on file at Greatwestern *781 Trading Company." No registration certificates for progeny from this program were produced by Dr. Jost or Dr. Godwin. Neither Dr. Jost's nor petitioner Godwin's 1986 taxable years are before the Court in these cases; however, respondent disallowed maintenance fees in the amount of $ 20,400 deducted by petitioner Godwin on his 1987 income tax return with respect to this program. The Experts
The cows in the donor program were appraised by petitioners' expert, James C. Mitchell. Respondent's experts who appraised the cattle were Dr. C. K. Allen and Ron Daily. Additionally, Dr. Allen and Mr. Daily appraised the embryos in the two embryo programs. All of the appraisers qualified as expert witnesses under Rule 143(f) and testified at trial. Mr. Mitchell, petitioners' expert, received his B.S. degree in animal science from the University of Kentucky and was involved in beef cattle management since 1970. His experience with Simmental cattle over a period of more than 20 years included showing and selling the breed in several States and serving on the board of trustees for the American Simmental Association during 1980-86. Mr. Mitchell reviewed the registration certificates *782 of all the cows acquired by petitioners in the donor cow program and inspected or observed some, but not all, of the cows. Mr. Mitchell based his conclusions as to the value of the cows upon the pedigree and weaning weight information contained in the registration certificates and his observation of the donor cows. The average value of the donor cows reflected in Mr. Mitchell's report (using the values in his second report) is $ 3,311.36 per cow. Mr. Mitchell did not express an opinion as to the value of the embryos in either the 1984 or the 1986 programs. Respondent's first expert, C. K. Allen, is an associate professor of agriculture at Northwest Missouri State University with a B.S., M.S., and Ph.D. in animal husbandry. Dr. Allen has experience in animal breeding and genetics as well as cattle valuation and cattle management. Dr. Allen researched the value of Simmental cattle during 1984, the year of purchase, including Canadian as well as U. S. sales figures. He also inspected the donor cows and factored in individual merit, reviewing the pedigrees and weaning weights of each cow. The average value of the donor cows shown in Dr. Allen's report is $ 2,891.58 per cow. Dr. *783 Allen also appraised the embryo units in the 1984 and 1986 embryo programs, concluding that none of the units had any positive value, primarily because the information shown on the embryo assignment sheets was inadequate to identify the embryos for purposes of registering the resulting calves. Respondent's second expert, Ron Daily, received his B.S. degree in animal science in 1970 and has spent 15 years managing cattle operations, 7 years conducting agricultural appraisals, and 2 years as executive secretary of the Texas Angus Association. He is a member of several professional associations, including the International Society of Livestock Appraisers and the American Society of Farm Managers and Rural Appraisers. His appraisal was based on the market data approach, comparing the subject property with other Simmental, Brahman, Salers, Simbrah, and Romagnola cattle and embryos of like quality, size, and age that were sold in 1984 through 1986. Mr. Daily's opinion was that the value of the donor cows as of June 1, 1984, was $ 3,374 per cow. Using a cost approach, Mr. Daily determined values for the embryo units in the 1984 and 1986 embryo programs of between $ 6,647.60, assuming *784 the donor cow had a value of $ 3,374, and $ 10,252.90, assuming the donor cow had a value of $ 25,000. He also expressed an opinion of the value of the programs on a "per pregnant recipient with embryo" basis, taking into consideration the limited individual sire and dam information shown on the embryo assignment sheets for each petitioner. His value under that method ranged from $ 6,650 to $ 10,100 per unit for the 1984 embryo program units and $ 12,500 for the 1986 embryo program units. Petitioners' Purchases and Involvement in the Programs
Petitioners did not obtain appraisals of the donor cows or embryo units before investing in the programs and did not negotiate the purchase prices of any of the programs. They did not consult independent cattle experts to determine if the projections contained in the offering memoranda were reasonable, or whether they could realize a profit from the programs. Petitioners did not attempt to contact or consider competitors or other cattle producers involved in donor cow and embryo programs. While some petitioners made inquiries about the business reputation of World Wide Capital Management, none of them investigated the qualifications *785 of the cattle manager, William Max Young. Similarly, petitioners made no inquiries about Rivergold Farms before entering into the lease agreement. Petitioners were unaware of common ownership between Rivergold and Alberta Livestock Transplants at the time of the lease. Information identifying the specific donor cows purchased by petitioners was not provided to them until several months after the purchase documents were executed. In several instances, the donor cows originally designated by the cattle managers in correspondence with petitioners were not the cattle for which petitioners eventually received registration certificates. Although it was represented in the offering materials that the donor cows were to have been capable of producing embryos in the year purchased (and therefore should have been at least 18 months to 2 years old), based on the registration certificates, a number of the cows were less than 6 months old at the time petitioners entered the program. Petitioners were generally not aware of the age of the cattle purchased until they commenced preparation for trial of these cases. Petitioners did not negotiate the terms of the lease with Rivergold and were *786 not provided any information concerning embryo production of their donor cows during the Rivergold lease. Even though petitioners had executed agreements for the care and maintenance of their cows with William Max Young & Associates, no documents were ever executed to rescind the prior agreements at the time Rivergold took over the cows as lessee. Petitioners participating in the two embryo programs produced a combined seven registration certificates they claim represented calves born from 12 embryo units; however, none of the progeny reflected in the certificates matched any of the designations on the embryo assignment lists, and two of the registration certificates were for cattle born of natural breeding, not embryo transfer. During the years in issue, petitioners claimed deductions for depreciation, cattle maintenance, and interest expenses, as well as investment credits for the donor cow program and embryo programs. ULTIMATE FINDINGS OF FACT The average fair market value of the donor cows purchased by petitioners on the date of purchase was $ 3,374 each pursuant to the opinion of Mr. Daily. The fair market value of the 1984 and 1986 embryo units on the dates of purchase *787 was $ 250 per unit. The transactions in which petitioners acquired the donor cows and embryo units and sold embryos and embryo calves were not arm's-length, negotiated transactions. The lease with Rivergold Farms was not an arm's-length, negotiated transaction. OPINION Respondent disallowed losses and investment credits claimed by petitioners with respect to the donor cow program and each of the two embryo programs. Respondent also determined that petitioners were liable for additions to tax under sections 6653(a)(1) and (2), 6659, and 6661, and increased interest under section 6621(c). Respondent maintains that petitioners' transactions as to each of these programs should be disregarded for tax purposes because the programs lacked economic substance. Respondent also argues that the programs constituted generic tax shelters pursuant to Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). It is well settled that transactions without business purpose or economic substance, apart from anticipated tax consequences, are to be disregarded for tax purposes. Knetsch v. United States, 364 U.S. 361, 365-370 (1960); *788 Gregory v. Helvering, 293 U.S. 465, 469-470 (1935); Hulter v. Commissioner, 91 T.C. 371, 388 (1988). The economic realities, rather than the form or labels employed by the parties, control the tax consequences of a transaction. When taxpayers resort to the expedient of drawing up documents to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits, the particular form employed is disregarded for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). In evaluating the economic reality of a transaction, the typical focus is on the related factors of whether (1) the transaction had "economic substance", and (2) the taxpayer had a business purpose beyond the generation of tax benefits. Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985). Business purpose is present where the investment "was not motivated *789 or shaped solely by tax avoidance features that have meaningless labels attached". Hilton v. Commissioner, 74 T.C. 305, 349-350 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). In general, the test for business purpose involves an inquiry of the investor's subjective purposes for entering the transaction. Levy v. Commissioner, 91 T.C. 838, 854 (1988). The inquiry into economic substance, as distinguished from business purpose, involves an analysis of the objective factors that indicate whether the transaction had a reasonable opportunity of producing a profit, exclusive of tax benefits. Levy v. Commissioner, supra.In Cherin v. Commissioner, 89 T.C. 986, 994-996 (1987), a case involving a purported sale of cattle, this Court looked at four factors in determining whether the transaction had economic substance: (1) Whether the stated price for the property was within reasonable range of its value; (2) whether there was any intent that the purchase price would ever be paid; (3) the extent of the taxpayer's control over *790 the property; and (4) whether the taxpayer would receive any benefit from the disposition of the property. Additional factors relevant here include the presence or absence of arm's-length negotiations; the structure of the financing; the degree of adherence to contractual terms; and the reasonableness of the income and residual value projections. Levy v. Commissioner, supra at 856. In the cases here, to allow petitioners the losses and investment credits claimed, the Court must find that: (1) The donor cow and embryo programs were bona fide; (2) the promissory notes executed by petitioners in connection with the transactions represented genuine indebtedness; and (3) petitioners intended to profit from their investments in the programs. The most important factor in determining whether the transactions were bona fide is the relationship of the price paid by petitioners for the donor cows and embryos and the respective fair market values of the cows and embryos. The normal attribute of a true arm's-length sale is a purchase price approximately equal to the fair market value of the thing sold; a totally disproportionate purchase price strongly militates *791 against a conclusion that a true sale has taken place. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1240-1241 (1981). The parties presented experts who submitted reports and testified as to the value of the donor cows at the time petitioners entered into the programs. These experts, including petitioners' expert, valued the cows at amounts substantially less than what petitioners agreed to pay for the cows. The consensus of all experts was that the cows averaged in value from $ 2,891.58 to $ 3,374 per cow. However, petitioners' purchase prices were $ 26,000 and $ 28,500 per cow. Assuming each cow had a value of $ 4,000, a price of $ 26,000 per cow means that the buyer (investor) paid 6.5 times more than the cow was worth. Petitioners, however, argue that the cows were more valuable because they were purchased for use in an embryo transplant program and should, therefore, be valued on the basis of the potential income that could be derived from the embryo program. None of the expert witnesses subscribed to this view, and petitioners offered no evidence, other than their own opinions, to support this valuation theory. Dr. Allen stated *792 that the "stream of income" approach is not used in the cattle industry to value donor cows, and Mr. Daily also noted that the use of an income approach is not used in the cattle industry to appraise beef cattle. Petitioners' expert witness, Mr. Mitchell, stated that he did not use the income method to value petitioners' cattle. Petitioners also argued that access to Alberta Livestock Transplants' technology and the expertise of the cattle manager, William Max Young & Associates, in selecting and caring for the donor cows added value to the cows; however, petitioners provided no evidence to support this proposition, and the testimony of the experts was to the contrary. Both of respondent's expert witnesses found the assumptions underlying the economic projections contained in the donor cow and embryo offering memoranda overly optimistic. Mr. Daily's report notes that the assumption in the offering memorandum that investors could expect 24 embryos per year per cow for each of 5 years of the program was an overestimation of the number of embryos that could realistically be expected from each donor cow over the course of the program. While this number of embryos conceivably could *793 be expected the first year, Mr. Daily was of the opinion that it was not feasible to expect that number of embryos in the succeeding years because the continuous practice of flushing disrupts a cow's normal reproductive cycle. His opinion not only was based on his own experience but also was supported by articles of researchers in embryo transplant technology. In the opinion of Mr. Daily, the projected value of embryos from petitioners' cows, $ 750 per embryo, was too high. Dr. Allen was also of the opinion that the projected number of embryos from each cow was not likely to be attained, and that the projected value of $ 750 per embryo was not realistic given the quality of petitioners' donor cows and the high cost of producing embryo pregnancies. Dr. Allen also noted that the maintenance costs required under the programs exceeded the amounts that would normally be agreed to by knowledgeable cattle owners. Mr. Daily agreed with Dr. Allen that payment of one-half of the embryos for Alberta Livestock Transplants' services was excessive. Petitioners' arguments that the value of the cows increased because the cows were in an embryo transplant program is not supported by the evidence. *794 Nor is there any evidence that the purchase price petitioners agreed to pay for the program included any other tangible or intangible property or rights that would justify the price paid. Petitioners' donor cows were eventually sold at auction in 1989 for $ 700 per head as ordinary commercial beef cattle rather than premium registered cattle. Perhaps the most succinct characterization of the economic substance of the donor cow program was set forth by Dr. Allen, who, in his report, pragmatically observed: The Business Plan Outline stated that it was expected that each donor will produce 24 fertile embryos per year and half would belong to ALT for providing the ET labor, technology and marketing and the other half would belong to the investor. Further the Business Outline specified that the expectation was that sales of embryos and calves should fully retire the promissory note and pay interest as well as the high maintenance expenses and the donor cow would have a residual value of $ 5,000. They certainly were not talking about cows of the same caliber that I appraised. If you really get to the bottom line, why would anyone sell cows worth $ 26,000 or more for a down payment *795 of $ 1,820 or $ 1,995 when that is apparently the only payment that the investor will have to make and the rest of his payments and cost will come from revenue and residual value. Why not just keep the cow and all the income. In addition many of the donor cows were not raised cows and had to be purchased by ALT before they were placed in the program. Few producers would sell cows with the ability to produce this much income for a price that would make this program feasible.
On this record, the Court concludes that the donor cows were substantially overvalued. The Court accepts the values determined by Mr. Daily at $ 3,374 per cow. Petitioners presented no evidence as to the value of the embryos in the 1984 and 1986 embryo programs, for which they had agreed to pay between $ 36,000 and $ 39,000 per unit. Respondent's expert, Dr. Allen, concluded that the embryos had little or no value for the following reasons: (1) The embryo assignment sheets provided to petitioners as the only documentation to identify the embryos purchased did not contain pertinent information such as the registration numbers and complete names of the sire and dam, the implant date, the date due to calve, *796 and whether the embryo was fresh or frozen; (2) some of the embryos appeared to have resulted from crossbreeding Simmental and Salers cattle, a cross that would have had little value; (3) some of the embryos appeared to be Romagnola, a breed that was not well known in the United States in 1984 and would have little value; and (4) the programs required extremely high maintenance and management fees. As a result of the above, Dr. Allen concluded that registration of the progeny would not have been possible because of inadequate information on the embryo assignment sheets. In his report, Dr. Allen summarized his opinion of the value of the embryos as follows: "If these embryo units were sold on the open market they would have no value. In other words, under the conditions and financial obligations of these programs informed buyers would not take them even if they were offered free." Mr. Daily, respondent's other expert, used a cost method in determining a value for the embryos. He considered as cost the $ 3,374 value he found for each of the donor cows and apportioned this cost over the total number of embryos to be produced by the cow over the 5-year period projected in the promoter's *797 offering memoranda, 24 embryos per cow per year for 5 years, and a conception rate of 50 percent. He then added to that the costs involved in preparing the cows for flushing and in implantation of the embryos in recipient cows. Under this cost method, Mr. Daily determined that each embryo unit (20 embryos) had a cost or value of $ 6,647 per unit. If the donor cows were valued at $ 25,000 each, the value of an embryo unit would be $ 10,251.90. Both values, as determined by Mr. Daily, are substantially less than the amounts paid by petitioners in the 1984 and 1986 programs. The Court disregards Mr. Daily's cost approach in determining the values of the embryos because his approach to value fails to take into account the demand for the product in the marketplace. It is recognized that, since the supply of a particular property may be greater or less than demand, the reproduction cost of such property may bear no relationship to its fair market value. Tracy v. Commissioner, 53 F.2d 575 (6th Cir. 1931), affg. Huron Bldg. Co. v. Commissioner, 15 B.T.A. 1107 (1929). As a general proposition, replacement cost is not favored *798 for tax purposes in arriving at fair market valuations. Ingram-Richardson, Inc. v. Commissioner, T.C. Memo. 1972-157. While reproduction cost may be a factor in determining fair market value, there must be a showing that there is a demand for the property. Lloyd A. Fry Roofing Co. v. Commissioner, T.C. Memo. 1970-298. Replacement cost is not a valid estimate of fair market value in a declining market. Milbrew, Inc. v. Commissioner, 710 F.2d 1302 (7th Cir. 1983), affg. T.C. Memo. 1981-610; Fox River Paper Corp. v. United States, 165 F.2d 639 (7th Cir. 1948). Mr. Daily expressed no opinion that the embryos could have been sold for the cost he determined as the value of the embryos, or that there was a market for the embryos at these prices. Dr. Allen noted in his report that, in 1984, there were too few embryos sold to establish a market value, and that the conditions and guarantees among the few known sales were highly variable, none of which were similar or comparable to the 1984 and 1986 embryo programs involved in the cases *799 here. Most sales of embryos involved pregnant recipients carrying embryos with known due dates in which the buyer purchased the recipient cow. Dr. Allen pointed out additional "down side" considerations in embryo breeding, such as abortion, calving difficulty, dead calves, high variability in type and performance even among siblings, inferior calves, and bull calves which usually had much lower values than female siblings. He also pointed out that embryos had little or no value unless a pregnancy rate was guaranteed and the sire and dam were among the very elite cattle of the breed. Mr. Daily stated explicitly in his report that the donor cows he appraised in these cases were not of the elite breeding stock that would command premium prices. The cost for production of the embryos, as determined by Mr. Daily, does not constitute an acceptable value for the embryos in these cases. The Court finds that the embryos had a value of $ 250 per unit in both the 1984 and 1986 programs. Petitioners argued that the purchase prices, while perhaps higher than fair market value, were paid in full by petitioners and should, therefore, be fully recognized for tax purposes. These payments were *800 made or effected by the credits by Alberta Livestock Transplants for sales of embryos or calves and lease payments made by Rivergold Farms to ALT. This argument presupposes that the embryo and calf sales and the donor cow lease were bona fide transactions. The evidence does not support such a conclusion. The embryo sales petitioners cite as the source of payment of expenses, interest, and principal before inception of the Rivergold lease appear to have had little, if any, substance. All embryos reported as sold on petitioners' behalf were purchased by Alberta Livestock Transplants, who acted both as petitioners' selling agent and as purchaser. All sales were apparently at prices set unilaterally by ALT. No evidence of any attempt to market the embryos to unrelated third parties is in the record. The lease transaction with Rivergold is similarly without substance. No evidence was introduced to show why Alberta Livestock Transplants would, apparently without receiving any consideration, relinquish its rights to one-half of the embryos obtained from flushing petitioners' donor cows in order to permit Rivergold to assume that role and retain all embryos for itself. This action *801 makes sense only when viewed in the context of the common ownership of majority interests in Rivergold and Alberta Livestock Transplants by Dr. Dyrholm and Mr. Mitenko, and the fact that the transactions essentially required only bookkeeping entries to effectuate the desired result. The Canadian revenue agent who investigated the transactions between Alberta Livestock Transplants and Rivergold described the series of credits and deductions as "a wash" insofar as the two Canadian companies were concerned for Canadian tax purposes -- virtually all amounts shown as income for one company were deductible as an expense by the other. No funds were exchanged except between the related companies, which essentially was a movement of money from one corporate pocket to another corporate pocket. Further, the lease did not effectuate any real change in the status of the cattle as between petitioners and Alberta Livestock Transplants. ALT, through Rivergold, continued its control over the cattle during the lease term as it had before, simply crediting the notes for their remaining balances through the device of lease payments rather than purchases of petitioners' one-half of the embryos. Finally, *802 it is illogical that Rivergold would be willing, in an arm's-length transaction, to pay $ 20,300 per head to lease cows which could have been purchased for less than $ 3,400 per head. The lease, and the credits to petitioners' notes and accrued accounts for maintenance of the cows, were nothing more than a means of showing petitioners' satisfaction of the notes representing the inflated purchase prices of the cattle without petitioners' being required to put forth any additional funds for that purpose. In the 1984 embryo program, petitioners point to Alberta Livestock Transplants' crediting of proceeds of sales of calves as the source of payment of their notes. However, there is no evidence that attempts were made to market any of the calves to unrelated third parties; all the sales were to Alberta Livestock Transplants, the original source of the embryos, for amounts set unilaterally by ALT. This permitted Alberta Livestock Transplants to merely credit petitioners' accounts receivable for maintenance costs and "pay off" petitioners' notes by means of bookkeeping entries, without requiring that the transactions yield any true proceeds payable to petitioners. Other than receipt *803 of two unencumbered cows worth little more than the cash they had invested in them, petitioners received no true economic benefit from the program. Even petitioner Jost testified that the fact that the embryo calf sales were all to Alberta Livestock Transplants and at prices that matched exactly the accrued expenses and note payments seemed strange to him: Q: When you saw the matching numbers there, what was your reaction? A: Well, it was a little disturbing that these animals were going back and forth to ALT in the first place. When they came out the same, my interpretation was that there may have been some collusion between ALT and Great Western in controlling the price they sold these at. Q: Can you elaborate? What did you think that collusion might be? A: Well, price fixing. I thought that ALT and Great Western had arranged to simply sell the cows back to them for the balance of the expenses so we would be satisfied and have two cows.
On this record, the Court concludes that the sales of embryos and calves to ALT and the lease with Rivergold were without economic substance. In addition to the wide discrepancy between the fair market value of the cows and *804 embryos and the price to the investor in the offering memoranda, there are other factors supporting the conclusion that there was no economic substance to petitioners' transactions. In Houchins v. Commissioner, 79 T.C. 570, 591 (1932), and Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. at 1237-1238, this Court identified six factors in determining whether a sale is bona fide. See also Cherin v. Commissioner, 89 T.C. at 997; Massengill v. Commissioner, T.C. Memo. 1988-427, affd. 876 F.2d 616 (8th Cir. 1989). These factors are: (1) Whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquires any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser receives any benefits from the operation or disposition of the property. Under these criteria, petitioners' transactions in the donor cow and embryo *805 programs were spurious. As to the first factor, petitioners produced registration certificates from the American Simmental Association and the American Brahman Breeders Association to establish legal title to the cows. Although the director of operations for the American Simmental Association testified that registration certificates do not show ownership and are not analogous to title documents, the fact that the cows were registered to petitioners, and that they eventually sold the cows at auction in 1989, with petitioners receiving the proceeds, indicates that this factor falls in favor of petitioners. The evidence of title in the embryo programs consisted of bills of sale that did not specifically identify the embryos. Lists or assignment sheets of purported embryos were produced at trial; however, the information contained on the lists was vague, at best, and, according to the expert witnesses, could not have been used to identify with certainty either the embryos or the calves that might have resulted from their implantation. Indeed, petitioners were unable to identify any calves that were born from embryos described on the embryo assignment sheets. The evidence is insufficient *806 to conclude that petitioners acquired legal title to the embryos. As to the second factor, there is considerable evidence that the parties did not treat the transactions as sales in either the donor cow or embryo programs. At the time the investments were made, none of the cows or embryo units had been assigned, and petitioners received no information identifying their property for several months or, in at least one case, more than 1 year after investing in the donor cow program. Petitioners never received documentation sufficient to identify what they purchased in the embryo programs. The seven calves claimed by petitioners to be 1984 embryo progeny could not have resulted from the matings described on the embryo assignment sheets, and petitioners were unable to otherwise identify any calves born from the embryo programs. Possession of the donor cows or embryos was not transferred to petitioners and remained with Alberta Livestock Transplants, or its related corporation, Rivergold, until the cattle were eventually sold at auction in 1989. The facts and circumstances show that neither petitioners nor the sellers acted as though sales to petitioners ever had taken place. As *807 is evident from the preceding discussion of the fair market value of the donor cows and embryo units, petitioners never acquired any equity in the property, the third factor noted above. The balances due on the promissory notes always greatly exceeded the values of the property purportedly acquired. The fourth factor is whether petitioners had any control over the property. The documents petitioners presented show that petitioners had complete control, exercisable through the cattle managers they contracted with to oversee the donor cows and embryo progeny. Petitioners emphasized at trial their selection of cattle managers to care for their cattle -- first William Max Young & Associates, then Leonard Bestgen and his company, Greatwestern Trading Company, and, finally, Morris & Howland, the business consultants who arranged the auction sale of the cattle for $ 700 per head in 1989. However, the reality is that petitioners were content to leave management of the cattle to whomever was suggested to them, and they never investigated the qualifications of any of the managers before agreeing to their employment. Mr. Bestgen was a former William Max Young & Associates employee, and *808 petitioners merely acquiesced in his succession to William Max Young & Associates as the manager. Mr. Bestgen, in turn, recommended Mr. Morris as his successor. In fact, petitioners had little, if any, control over the property until Mr. Morris assumed responsibility for the cattle and then sold the cattle shortly thereafter. Petitioners generally were only vaguely aware of the various locations where the cattle were maintained during the programs and received minimal information about their condition. The fifth factor is whether the purchaser bears the risk of loss or damage to the property. Although the documents indicate that petitioners bore the risk of loss, as a practical matter, because petitioners never acquired any equity in the overvalued cows and embryos, the seller bore such risk. While not formally guaranteed, petitioners expected to receive no less than 10 calves from each unit of 20 embryos purchased in the two embryo programs, regardless of the actual success rate for producing viable pregnancies from their unit. Petitioners understood they would have rights to no more than 10 calves per unit even if more than 10 calves were born from their 20 embryos. These *809 factors indicate that petitioners neither bore a significant risk of loss nor had the right to fully profit from the embryo unit production. The final factor is whether petitioners were likely to receive any benefits out of the production and disposition of their cows or embryo progeny. Since the donor cows and embryos were substantially overvalued, along with the other factors noted, there was little likelihood that petitioners would ever realize any benefits from the programs. On this record, the Court holds that there was no economic substance to the donor cow and embryo programs based upon the six factors set out in Houchins v. Commissioner, 79 T.C. 570 (1982) and Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221 (1981). Where a transaction is not conducted at arm's length by two financially self-interested parties, or where a transaction is based on "peculiar circumstances" which influence a purchaser to agree to a price in excess of the property's fair market value, the Court has disregarded indebtedness to the extent it exceeded fair market value of the purchased asset. See, e.g., Bryant v. Commissioner, 790 F.2d 1463, 1466 (9th Cir. 1986), *810 affg. Webber v. Commissioner, T.C. Memo. 1983-633; Odend'hal v. Commissioner, 80 T.C. 588, 604 (1983), affd. and remanded 748 F.2d 908 (4th Cir. 1984); Lemmen v. Commissioner, 77 T.C. 1326, 1348 (1981); Roe v. Commissioner, T.C. Memo. 1986-510, affd. without published opinion sub nom. Young v. Commissioner, 855 F.2d 855 (8th Cir. 1988), affd. without published opinion sub nom. Sincleair v. Commissioner, 841 F.2d 394 (5th Cir. 1988). Petitioners argue that the Court should recognize their indebtedness to the sellers under each program on the following grounds: (1) The notes were recourse; (2) petitioners believed they would have to pay the notes with other resources if the sales of embryos, embryo progeny, or the donor cows did not cover the debt; and (3) the notes were in fact paid by credits from the Rivergold lease and sales of embryos and calves to Alberta Livestock Transplants. It is the substance of such debt and not its form that must be considered. Waddell v. Commissioner, 86 T.C. 848, 902 (1986), *811 affd. per curiam 841 F.2d 264 (9th Cir. 1988). The courts have refused to give effect to notes which, on face, are recourse notes but which are unlikely to be enforced because of the surrounding circumstances. See, e.g., Patin v. Commissioner, 88 T.C. 1086, 1122-1124 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989); Helba v. Commissioner, 87 T.C. 983, 1009-1011 (1986), affd. without published opinion 860 F.2d 1075 (3d Cir. 1988). An indication that a loan is genuine is the care with which a prospective lender scrutinizes a transaction prior to making the loan to ensure it will be repaid. There is no evidence in these cases that the lender in any of the programs requested even the most rudimentary *812 financial information from the investors. The promissory notes in the donor cow and 1984 embryo program were unsecured, and, in all of the programs, the fair market value of the property for which notes were given in payment was significantly less than the principal amount of the notes. Each of these factors weighs against a finding that the notes represented bona fide indebtedness. As previously discussed, the claimed payment of the notes by means of bookkeeping entries reflecting non-arm's-length sales to Alberta Livestock Transplants of embryos or embryo calves and the equally non-arm's-length lease payments made to ALT by Rivergold are not credible. Under these circumstances, the Court concludes that the "indebtedness" represented by the notes in each program was not genuine; the notes did nothing more than create tax benefits by inflating the purchase prices of the property, thereby increasing petitioners' depreciation and investment credits in the case of the donor cows and also increasing the cost of the embryos deducted as current expenses in the embryo programs. Accordingly, petitioners' indebtedness cannot be recognized for Federal tax purposes. See Goldstein v. Commissioner, 364 F.2d 734, 740 (2d Cir. 1966), *813 affg. 44 T.C. 284 (1965). In summary, the Court holds that none of the transactions at issue, including the sales to petitioners of the donor cows and embryos, the subsequent lease to Rivergold, and the sales of embryos and embryo progeny calves back to Alberta Livestock Transplants had economic substance. Having held that the transactions lacked economic substance, the Court addresses the question whether petitioners had a business purpose other than tax avoidance in entering the programs. Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. T.C. Memo. 1987-628, affg. in part and revg. in part Larsen v. Commissioner, 89 T.C. 1229 (1987), affg. Moore v. Commissioner, T.C. Memo. 1987-626, affg. Sturm v. Commissioner, T.C. Memo. 1987-625. The "business purpose" test involves an inquiry into whether the taxpayer had a legitimate profit objective apart from tax considerations. Shriver v. Commissioner, 899 F.2d 724, 725-726 (8th Cir. 1990), affg. T.C. Memo. 1987-627. *814 The mere assertion of a subjective profit objective will not require recognition of a transaction for tax purposes where the transaction lacks economic substance. Cherin v. Commissioner, 89 T.C. at 993. Petitioners testified they entered into the programs seeking profits which might arise from successful embryo transplant breeding operations, and they relied entirely upon the cattle managers and Alberta Livestock Transplants to carry on the ventures. Despite this testimony, the Court is not convinced that petitioners actually had the objective of realizing economic gain from their cattle activities. Many of the same factors that demonstrate lack of economic substance are also important in considering whether petitioners had an "actual and honest profit objective" in engaging in the transactions at issue. Rose v. Commissioner, 88 T.C. at 411; Jasionowski v. Commissioner, 66 T.C. 312, 321 (1976). Additionally, in determining whether a taxpayer intended to profit from an activity in which participation is passive, the Court pays particular attention to whether the taxpayer was prudent *815 in acquiring the property and assigning duties to third parties with respect to the property, and the extent to which the taxpayer supervised the performance of such duties as the enterprise progressed. Flowers v. Commissioner, 80 T.C. 914, 932 (1983). Specifically, the Court takes into account (in addition to the factors previously discussed in this opinion) such factors as: Whether the taxpayer was knowledgeable of the industry, Sutton v. Commissioner, 84 T.C. 210, 224 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986), affd. sub nom. Knowlton v. Commissioner, 791 F.2d 1506 (11th Cir. 1986); whether the taxpayer attempted to obtain valid information about the industry or researched the feasibility of making a profit in a particular industry, Surloff v. Commissioner, 81 T.C. 210, 234-237 (1983); whether the taxpayer ultimately relied on the promoters of the program, Estate of Baron v. Commissioner, 83 T.C. 542, 555-556 (1984), affd. 798 F.2d 65 (2d Cir. 1986); whether the *816 purchase price was negotiated, Elliott v. Commissioner, 84 T.C. 227, 238 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); and whether any appreciable effort was spent monitoring the investment, Horn v. Commissioner, 90 T.C. 908, 936 (1988). The record does not support a finding that petitioners entered into the donor cow and embryo programs with economic profits in mind. Petitioners made no meaningful independent investigation of the cattle industry or of the risks associated with the use of embryo transplant technology in breeding registered cattle. While petitioners, who are medical doctors, demonstrated interest and general knowledge of genetics and were familiar with the mechanics of the procedures used in cattle embryo transplantation, they made no investigations of market values of registered cattle or the feasibility of the projections in the offering memorandum either before or after investing in the donor cow or embryo programs. The "business" aspect of the programs was clearly not an area about which petitioners had any knowledge or experience, and they made *817 no efforts to educate themselves in the business aspects of their activity. The promoters overestimated the number of embryos which would be produced from the donor cows, as well as the sales prices of embryos and the calves expected from the embryo programs. There is no evidence to substantiate the validity of the projections in the offering memoranda for the various programs. Both Dr. Allen and Mr. Daily observed that an investigation into market values of registered Simmental cows and embryos would have revealed that the donor cow program, as outlined in the offering memorandum, was not likely to be profitable. Similarly, a review of average market prices for Simmental cattle would have revealed that the projected market for calves from the embryo programs was not likely to be as represented in the offering memoranda. Nevertheless, petitioners never questioned or verified the projections. Information on market prices for such cattle in prior years was readily available from a variety of sources, including the American Simmental Association. The projections in the offering memorandum were based, in the opinions of the experts, on best-case scenarios which were very unlikely *818 to happen. Petitioners had the program materials and projections reviewed by accountants and lawyers but never consulted experts in the cattle industry to ascertain whether the economic projections were realistically achievable. Petitioners entrusted operation of the program entirely to managers about whom they knew little, if anything, other than the information set forth in the offering memoranda. Further, with the exception of Dr. Jost (who did travel to the offices of the manager in Arizona to obtain information on the identification and location of his donor cows and then went to see some of the cattle), petitioners appear to have been content with the little information provided by the cattle managers about the donor cow program. No information concerning the identity of the donor cows assigned to each petitioner was conveyed to petitioners until several months after their entrance into the programs, and certificates of registration reflecting their ownership on the American Simmental Association records were not received in some cases for more than a year. Moreover, the certificates, once received, often did not match the prior identifying information petitioners had been *819 provided. The registration certificates reflect that some petitioners had been assigned calves born in 1984 rather than mature cows capable of reproduction as they expected. Despite these discrepancies, there is no evidence in the record to indicate that petitioners sought or received clarification or correction of these matters. With respect to the embryo programs, except for a few registration certificates for animals that could not have resulted from the breedings shown on the embryo assignment sheets they had been provided, petitioners received no information identifying calves born of their embryo units. Petitioners were unable to positively identify any progeny that was consistent with the information they received identifying their embryos. Petitioners purchased 20 embryos per unit and believed they received 10 live births from the embryos but did not know if additional calves might have been born from their embryo units. Although the invoices they received showing sales of unidentified embryo calves reflected Alberta Livestock Transplants as the purchaser of all the calves sold, petitioners never questioned the way the sales were arranged, how the prices were determined, *820 and why the sales proceeds credited to them equaled exactly the service and maintenance charges payable by them. No amounts in excess of the predetermined maintenance costs and note payments were received by petitioners from any of the programs prior to the final liquidation of the remaining cattle. Although petitioners reported income from sales of embryos and the Rivergold lease in the donor cow program and from sales of calves in the embryo programs, they received none of the proceeds from any of these transactions and appear to have been content to merely receive credits against their obligations and no more. This lack of interest in the economic performance of the programs beyond their abilities to pay for themselves, together with the other factors, confirms that petitioners did not anticipate profits. Petitioners, however, did expect and realized substantial tax benefits from the programs, including deductions for depreciation, cattle maintenance, and interest expenses, as well as the investment credit for the donor cow program. Petitioners' notes were ostensibly satisfied by credits from the various transactions detailed above, so petitioners were not called upon for *821 additional funds for that purpose, and the cash investments petitioners made in the programs were fully recovered through tax refunds or offsets of tax liabilities they would have incurred on income from other sources. On this record, the Court concludes that petitioners engaged in the transactions to obtain tax deductions and credits and thereby reduce the taxes they would otherwise have been required to pay on their substantial income from other sources. See Beck v. Commissioner, 85 T.C. 557, 570-571 (1985); sec. 1.183-2(b)(8), Income Tax Regs.
Since the transactions lacked economic substance and profit motive, the claimed depreciation and expense deductions and investment credits are not allowable. Accordingly, it is not necessary to address the alternative issues raised by respondent other than those involving petitioners' interest deductions and the additions to tax and increased interest. The deductibility of interest focuses on the character of the underlying indebtedness -- essentially, whether the debt is bona fide. As discussed previously, the Court examines the substance of the debt and is not guided solely by its form. Debt that, in *822 fact or in substance, is unlikely to be paid lacks economic substance. Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. per curiam 841 F.2d 264 (9th Cir. 1988); Estate of Baron v. Commissioner, 83 T.C. 542, 555-556 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Due to the inflated purchase prices, the notes petitioners executed represented amounts far in excess of the fair market values of the property which they purportedly purchased. Although "recourse" on face, the notes were so commercially unreasonable the Court does not believe they were ever intended to be repaid and, therefore, holds the notes did not represent bona fide indebtedness sufficient to support interest deductions. The payment of the notes through bookkeeping credits generated by the Rivergold lease and sales of embryos and calves to Alberta Livestock Transplants is not determinative, since the Court has found that such transactions were not arm's-length and were sham transactions. On this record, the Court holds that petitioners have not established their entitlement to interest deductions. *823 Respondent is sustained in the disallowance of the losses, deductions, and credits claimed by petitioners in all these cases. As a result of the conclusion that the transactions lacked economic substance, petitioners are allowed an appropriate adjustment to eliminate any income they reported from these transactions. See supra note 4. The remaining issues are the additions to tax and increased interest. Respondent determined that petitioners were negligent in claiming their losses and investment credits and, therefore, determined that they were liable for the additions to tax under section 6653(a)(1) and (2). [7] Section 6653(a)(1) provides that, if any portion of an underpayment is due to negligence or intentional disregard of rules or regulations, an amount equal to 5 percent of the underpayment is added to the tax. Section 6653(a)(2) provides for an addition to tax equal to 50 percent of the interest on the portion of the underpayment attributable to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). *824 Petitioners deducted depreciation and claimed investment credits on the donor cows based upon prices which significantly exceeded fair market values. Similarly, petitioners in the embryo programs claimed deductions on prices far in excess of the fair market value of the property purportedly purchased. Petitioners made no significant attempts to consult with any independent person having the appropriate expertise to evaluate the validity of the factual representations in the offering materials before relying upon them in claiming tax benefits. Some petitioners testified they consulted with their accountants about the tax benefits represented in the offering memoranda. The Courts have absolved taxpayers from additions to tax for negligence where the taxpayer: (1) Consulted a fully qualified, independent accountant; (2) fully disclosed the facts *825 to the accountant; and (3) then relied upon the accountant's advice in good faith. See, e.g., Betson v. Commissioner, 802 F.2d 365, 372 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-264; Leonhart v. Commissioner, 414 F.2d 749 (4th Cir. 1969), affg. per curiam T.C. Memo. 1968-98. However, petitioners did not call their accountants as witnesses, and the record does not disclose the extent and substance of the facts petitioners disclosed to their accountants or the essence of the advice given as a result. See Skeen v. Commissioner, 864 F.2d 93, 96 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987). Moreover, the Court is skeptical that the accountants or tax advisers possessed the necessary knowledge about donor cows and embryos to intelligently correlate such knowledge with the tax aspects of the transactions. In summary, petitioners' conduct does not evidence the due care and prudence required by the statute. Therefore, respondent's determination that petitioners are *826 liable for the additions to tax under section 6653(a)(1) and (2) is sustained. Respondent also determined, as to all petitioners, the section 6659 addition to tax for underpayments attributable to a valuation overstatement. [8] *829 Section 6659 imposes a graduated addition to tax where an underpayment of $ 1,000 or more is attributable to a valuation overstatement. Section 6659(c) provides that there is a "valuation overstatement" if the value of any property, or the adjusted basis of any property, claimed on a return is 150 percent or more of the correct value or correct adjusted basis. When a transaction lacks economic substance, section 6659 will apply because the correct basis is zero and any basis claimed in excess of that is a valuation overstatement. Gilman v. Commissioner, 933 F.2d 143 (2d Cir. 1991), affg. T.C. Memo. 1990-205; Rybak v. Commissioner, 91 T.C. 524, 566-567 (1988); Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992). This Court and others have found section 6659 *827 applicable when credits and deductions are disallowed in their entirety due to a lack of economic substance, lack of profit objective, or lack of bona fide sale of the property, when valuation is an integral factor in such determinations. Gilman v. Commissioner, supra at 151; Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427; Harness v. Commissioner, T.C. Memo. 1991-321; Diego Investors -- IV v. Commissioner, T.C. Memo. 1990-102. In situations where there are arguably two grounds to support a deficiency and one supports a section 6659 addition to the tax and the other does not, the taxpayer may still be liable for the addition to tax. Harness v. Commissioner, supra (citing Gainer v. Commissioner, 893 F.2d 225, 228 (9th Cir. 1990), affg. T.C. Memo. 1988-416, and Irom v. Commissioner, 866 F.2d 545, 547 (2d Cir. 1989), vacating and remanding T.C. Memo. 1988-211). *828 The Court has held that the transactions in these consolidated cases lacked economic substance, and the donor cows and embryos were overvalued. The deficiencies, therefore, are attributable to overstatements of value and are subject to the section 6659 addition to tax. Gilman v. Commissioner, supra; Massengill v. Commissioner, supra; Harness v. Commissioner, supra; Donahue v. Commissioner, supra.Accordingly, respondent is sustained on this issue as to all petitioners. [9]
*830 Respondent determined that petitioners are liable for the addition to tax under section 6661 for all post-1981 taxable years except the 1985 year for petitioner Boyer. With respect to Dr. Godwin's 1984 tax year and the 1985 and 1986 tax years of petitioner Nix, the section 6661 addition to tax was determined in the notices of deficiency. Therefore, these petitioners, for these years, bear the burden of proof. However, as to all other years, the section 6661 addition to tax was first asserted by respondent in answers or amended answers. Consequently, respondent bears the burden of proof for those years in which this addition to tax was raised in the answer. [10] Rule 142(a). *831 Section 6661(a) imposes an addition to tax if there is a substantial understatement of income tax. A "substantial understatement" is defined as an understatement which exceeds the greater of $ 5,000 or 10 percent of the amount of tax required to be shown on the return. Sec. 6661(b)(1). Any portion of the understatement that is also subject to the addition to tax under section 6659 for a valuation understatement is not taken into account in determining the substantial understatement of tax for purposes of section 6661. Sec. 6661(b)(3). In calculating understatements under section 6661(a), items for which there is substantial authority or with respect to which all relevant facts were adequately disclosed in the tax return, or in a statement attached to the tax return, are not to be considered. Sec. 6661(b)(2)(B). However, in the case of a "tax shelter", even full disclosure in the tax return does not reduce this addition to tax. Sec. 6661(b)(2)(C)(i). For this purpose, section 6661(b)(2)(C)(ii) defines a tax shelter as any partnership, entity or other plan or arrangement, the principal purpose of which is the avoidance or evasion of Federal income tax. Except as noted herein, *832 the understatements in tax are "substantial" within the definition of section 6661(b)(1). The Court holds that the transactions in these cases lacked economic substance and business purpose; the principal purpose for the transactions was to reduce petitioners' income tax liabilities. Accordingly, the additions to tax under section 6661(a) are sustained except as to understatements that are reduced below the threshold amounts by adjustments to income consistent with the Court's holding or by application of section 6659. Finally, respondent determined that the increased rate of interest under section 6621(c), formerly section 6621(d), for substantial understatements attributable to tax-motivated transactions applies to petitioners' donor cow and embryo activities. Tax-motivated transactions under section 6621(c) include valuation overstatements as defined by section 6659 and any sham or fraudulent transaction. Sec. 6621(c)(3)(A)(i), (v). This Court has interpreted "any sham or fraudulent transaction" to include transactions that lack economic substance. McCrary v. Commissioner, 92 T.C. 827, 857 (1989). Accordingly, respondent is sustained on this *833 issue as to all petitioners. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: R. Dale Jost, docket No. 6765-89; Billy G. and Doris A. Nix, docket No. 6476-90; and Charles W. and Deborah J. Godwin, docket No. 12620-90.↩
2. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 120 percent of the interest due on the deficiency.↩
2. 5 percent of the deficiency and 50 percent of the accrued interest on the deficiency attributable to negligence. For 1986 and subsequent years, the additions to tax are determined under sec. 6653(a)(1)(A) and (B).↩
3. Sec. 6661 addition to tax asserted by respondent by amendment to answer.↩
1. 120 percent of the interest due on the deficiency.↩
2. 5 percent of the deficiency and 50 percent of the accrued interest on the deficiency attributable to negligence. For 1986 and subsequent years, the additions to tax are determined under sec. 6653(a)(1)(A) and (B).↩
3. Sec. 6661 addition to tax asserted by respondent by amendment to answer.↩
1. 120 percent of the interest due on the deficiency.↩
2. 5 percent of the deficiency and 50 percent of the accrued interest on the deficiency attributable to negligence. For 1986 and subsequent years, the additions to tax are determined under sec. 6653(a)(1)(A) and (B).↩
3. Sec. 6661 addition to tax asserted by respondent by amendment to answer.↩
1. 120 percent of the interest due on the deficiency.↩
2. 5 percent of the deficiency and 50 percent of the accrued interest on the deficiency attributable to negligence. For 1986 and subsequent years, the additions to tax are determined under sec. 6653(a)(1)(A) and (B).↩
4. Sec. 6661 addition to tax asserted by respondent by answer.↩
3. Petitioners Jost and Godwin are the only petitioners in these cases who participated in the 1986 embryo program; however, the year 1986 in which they invested is not before the Court as to either of these petitioners. Petitioner Godwin's 1987 tax year is before the Court and certain deductions claimed by him for 1987 relate to the 1986 embryo program. As to petitioner Jost, the only year before the Court in these cases is 1985, a year prior to his participation in the 1986 embryo program.↩
4. In amended petitions, petitioners allege that they should be allowed theft loss deductions under sec. 165 for their actual cash expenditures if the losses and credits claimed on their returns are disallowed on the grounds that the transactions did not occur or should not be recognized for tax purposes; however, petitioners presented no evidence to that effect and did not address this contention in their briefs. Accordingly, the issue is deemed waived. In answers to amended petitions, respondent acknowledged that, if the transactions are found not to have been of economic substance, any income reported by petitioners from the transactions in question should not be recognized except to the extent of cash or cash equivalents received.↩
5. The majority of the cows purchased by petitioners were registered through the American Simmental Association as "purebreds", a designation requiring that each cow be at least seven-eighths Simmental. Petitioners Boyer, Jost, and Godwin each purchased one registered Brahman cow, which were registered through the American Brahman Breeders Association.↩
6. With respect to the 1984 embryo program, respondent agreed that, if the program had economic substance and business purpose, the embryo costs were currently deductible under Rev. Ruls. 87-105, 1987-2 C.B. 46, and 86-24, 1986-1 C.B. 80. However, for any embryo investments after Feb. 24, 1986, which would include the 1986 embryo program, respondent's position is that embryo costs are not currently deductible even if the program had economic substance and business purpose, and that such costs are capital expenditures under Rev. Ruls. 87-105, 1987-2 C.B. 46, and 86-24, 1986-1 C.B. 80↩.
7. Sec. 6653(a)(1) and (2) was redesignated as sec. 6653(a)(1)(A) and (B), effective for years after 1985. The discussion above encompasses both versions of the statute.↩
8. Respondent concedes that the addition to tax under sec. 6659 is not applicable in the case of petitioners Boyer for taxable year 1983 because the deficiency determined by respondent for that year is not attributable to the cattle investments involved in these cases. Further, respondent concedes that adjustments to remove income reported by petitioners Nix in 1986, consistent with the Court's holding that the transactions at issue lacked economic substance, will reduce the underpayment of tax below the $ 1,000 threshold for sec. 6659 purposes.↩
9. In Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416, the taxpayer was held not liable for the sec. 6659 addition to tax even though the taxpayer claimed deductions and credits on an overvalued asset. The deductions and credits related to that asset were disallowed on the ground that the asset had not been placed in service in the year in which the deductions and credits were claimed; therefore, the deficiency in tax was not "attributable to" a valuation overstatement within the meaning of sec. 6659. See Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987); see also Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408. None of the cases of the petitioners here is appealable to the Fifth Circuit. The case of Dr. Jost, here, is appealable to the Ninth Circuit and this Court, under Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), follows the law of the circuit to which an appeal lies. However, the facts of Dr. Jost's case are distinguishable from Gainer v. Commissioner, supra, in that the disallowed deductions and credits are not based upon the year or years the overvalued assets were placed in service; therefore, the deficiencies in tax in the case of Dr. Jost are "attributable to" a valuation overstatement. Also, respondent concedes that, of the $ 36,000 or $ 39,000 per unit deducted by petitioners Jost, Godwin, and Boyer for their investment in the 1984 embryo program, only $ 29,500, representing the cost of the ova and semen implanted, is subject to the sec. 6659 addition to tax pursuant to Soriano v. Commissioner, 90 T.C. 44↩ (1988). Similarly, respondent concedes that the sec. 6659 addition is applicable to only the $ 31,500 cost of the implanted ova and semen of the total $ 38,000 per unit invested in the 1986 embryo program.
10. Respondent concedes that the sec. 6661 addition to tax is not applicable to the Boyer's 1983 taxable year because the deficiency is not attributable to the cattle investments at issue in these cases. Respondent concedes that adjustments to "phantom" income consistent with the Court's holding that the transactions lacked economic substance will render the sec. 6661 addition inapplicable to petitioner Jost's 1985 taxable year and petitioners Nix's 1985 and 1986 taxable years.↩